IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| Tracie Marie Porcheddu[1], | § | Case No.  05-40177-H1-13 |
| Debtors. | § | |

## MEMORANDUM OPINION REGARDING CONDUCT OF R. J. BRYANT AND BARRETT BURKE WILSON CASTLE DAFFIN & FRAPPIER, L.L.P.

For the reasons set forth below, the Court finds that R. J. Bryant ("Bryant") and the law firm of Barrett Burke Wilson Castle Daffin & Frappier, L.L.P. ("Barrett Burke") must be sanctioned.  Barrett Burke is one of the leading firms representing creditors in consumer bankruptcy cases in the United States Bankruptcy Court for the Southern District of Texas. Although Barrett Burke represents a variety of creditors, the firm specializes in representing home mortgage lenders who seek relief from the automatic stay in consumer chapter 7 cases and in chapter 13 cases.  Bryant is a trial attorney for Barrett Burke.

On November 2, 2004, this Court issued its show cause order against Bryant and Barrett Burke.  Hearings were held on December 1, 2005 and December 8, 2005.

### Summary of Findings

Barrett Burke engaged in a systematic effort to mislead the United States Bankruptcy Court for the Southern District of Texas with respect to its efforts to shift fees from Barrett Burke's clients to consumer debtors.  These efforts were undertaken to achieve an end that Barrett Burke believed reasonable—the collection of "reasonable" fees on behalf of Barrett Burke's clients.  Because of the methods undertaken by Barrett Burke, it is not possible to know whether the fees sought by Barrett Burke were, in fact, reasonable.  Bryant gave false testimony before this Court that supported the deception.

---

[1]  Since the initial hearings on this matter, Ms. Porcheddu died.  However, her death does not end the necessity of the Court's inquiry.

Although the Court's analysis of the sanctions identifies other persons employed by Barrett Burke, only Bryant and Barrett Burke were the subjects of this Court's show cause order. Accordingly, the Court has not considered sanctions against any other person.

### Events Before this Court

Prior to October 1, 2004, it was this Court's routine practice (and the routine practice in this District) to approve uncontested attorney's fees to mortgage lenders in consumer cases without the necessity of a hearing. On October 1, 2004, this Court announced that it would require an evidentiary hearing before it would approve uncontested fee shifting by secured creditors if the proposed fee shifting exceeded $500.00.

Barrett Burke requested and received the first such hearing, which was scheduled for October 7, 2004. One of Barrett Burke's senior attorneys (Walter Thurmond) appeared at the hearing. That hearing was in the case of Stevie and Ethel Calhoun, case number 04-36567. Mr. Thurmond advised the Court:

> Your honor, in our office we do keep contemporaneous records of all tasks performed on a file from the time that it comes into our office until the time that it is completed. I have personally reviewed those … all those time entries… yesterday and prepared this summary myself.

Mr. Thurmond then gave a detailed description—in part giving tenth of an hour increments of time—as to the fee bill. Between October 7, 2004 and October 21, 2005, this Court conducted numerous hearings with respect to Barrett Burke's fee shifting requests. The requests were uniformly granted.

At each hearing, Barrett Burke would present a fee statement. The fee statements uniformly appeared to be actual. Exhibit 2 to this hearing is an exemplar of the typical fee statement produced. The document is labeled "Attorney Time/Fee Breakdown." It contains five columns. Column 1 lists the date. Column 2 lists a description of the activity that is billed on

the referenced date. Column 3 lists the initials of the timekeeper that performed the task. Column 4 lists the amount of time spent by the timekeeper on the task. Column 5 is the result of multiplying column 4 by that timekeeper's hourly rate. Timekeeper hourly rates are listed at the bottom of the statement.

At the hearing held in this case, the debtor challenged the accuracy of the fees. At the hearing on the fees, Bryant gave detailed testimony. The testimony included testimony that the fee statements were contemporaneous business records maintained by Barrett Burke, that Bryant was a custodian of the records, and that the time entries were made on a contemporaneous basis. Barrett Burke and Bryant now acknowledge that all of that testimony was wrong. The fee statements were not business records of Barrett Burke; they were created solely for the purpose of litigation. Bryant had no idea how the records were maintained and she was not a custodian of the records. Time entries were made after-the-fact and only in preparation for litigation; only task records were maintained on a contemporaneous basis.

In closing arguments, Barrett Burke took solace in Mr. Thurmond's carefully chosen words on October 7, 2004. His statement was only that the task records were contemporaneous, not that the corresponding time entries were contemporaneous. Notably, he did not affirmatively advise the Court that the fee statement's time entries were made after-the-fact. Thurmond described the fee statement as a "summary" of Barrett Burke's records; it was not a summary. The fee statement included the task entries (which were contemporaneous and were summarized from the firm's records) but also included time entries that had not previously existed at all. It is not possible to create a summary from non-existent records. The inclusion of new information— not captured in Barrett Burke's records—makes the document something other than a summary. Instead, it is a document prepared for the purposes of litigation. In this case, it was a document

3

prepared for litigation for the purpose of avoiding the hearsay rule. Far from meeting a duty of candor to the Court, Thurmond's October 7, 2004 statement appears to have been intended to misdirect the Court. That sleight of hand was carried forward for a year and culminated in Bryant's false testimony on October 21, 2005.

Barrett Burke wants the Court to believe that the Court simply misunderstood Barrett Burke's practices—not that Barrett Burke misled the Court. Such a position is not warranted on the facts. After this Court's October 1, 2004 announcement, Barrett Burke's senior attorneys (Walter Thurmond, Yvonne Knesek and Mary Daffin) met to determine how to address the Court's requirement. Barrett Burke decided to create a template for fee summaries. Thurmond instructed the staff to include the information from Barrett Burke's contemporaneous task entries and, when it later became necessary to compile a fee statement, "then I instructed them to put down the time that it took for them to do that task." Thurmond testimony, 12/1/2005, p. 148, l. 8-9. After the time entries were made, Thurmond and others reviewed the time entries to assure that they were reasonable.

In the typical case, the Court receives Barrett Burke's fee statement without objection. The fee statement is reviewed by the Court. It sets forth the number of hours worked on a particular task, a brief description of the task, the hourly rate for the billing individual, and the amount of the fee based on hours worked and billed rate. Put simply, the fee statements set forth the lodestar calculation. The Court then evaluates the lodestar amount from the fee statement in light of the *Johnson* factors.

As set forth below, Barrett Burke's presentation did not allow the Court to meet its responsibility. Instead, by adjusting after-the-fact time entries to Barrett Burke's view of reasonableness—and then holding the fee statements out to be Barrett Burke's business

4

records—Barrett Burke substituted its own judgment for that of the Court. In the process, it eliminated the ability of trustees, creditors and other parties in interest to engage in the adversarial process that the Bankruptcy Code requires for fee shifting in bankruptcy cases.

### Attorneys Fees in Consumer Cases

In 2005, there were 18,355 motions for relief from the automatic stay filed in chapter 7 or chapter 13 cases in the United States Bankruptcy Court for the Southern District of Texas. Although precise statistics are not readily available, the Court estimates that Barrett Burke filed over 5,000 of those motions.

The vast majority of the motions for relief result in agreed or default orders. As with any litigation, Barrett Burke's clients must pay attorneys fees and costs when they prosecute a motion for relief from the automatic stay. Barrett Burke's clients are entitled to recover their attorneys fees and costs when they hold claims that are "secured by property the value of which ... is greater than the amount of such claim." 11 U.S.C. § 506(b); *United Sav. Ass'n. of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988); *In re Nair,* 320 B.R. 119 (Bankr. S.D. Tex. 2004). In addition, Barrett Burke's clients may be entitled to recover their attorneys fees and costs in chapter 13 cases because of § 1322(b)(2)'s restriction on the ability of a debtor to modify the rights of a holder of a claim secured only by a security interest in real property that is the debtor's principal residence. *See* 11 U.S.C. § 1322(b)(2).

Nevertheless, secured creditors may not recover attorneys fees and costs without regard to reasonableness. When a party seeks to shift fees in a motion for relief from the stay, the amount of allowed fee shifting is determined by federal law. *In re Johnson,* 756 F.2d 738 (9th Cir. 1985); *In re Nair,* 320 B.R. at 119.

In the Fifth Circuit, fee shifting is governed by *Johnson v. Ga. Highway Exp.,* 488 F.2d 714 (5th Cir. 1974). *See In re Cahill,* 428 F.3d 536 (5th Cir. 2005). *Johnson* requires the Court to "first calculate a lodestar fee by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. Next, the court must consider whether the lodestar should be adjusted upward or downward, depending on the circumstances of the case, and the factors set forth in *Johnson*...." *Green v. Adm'rs of Tulane Educ. Fund,* 284 F.3d 642, 661 (5th Cir. 2002)(citations omitted).

The *Johnson* factors require consideration of (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *In re Cahill,* at 540, n.4.

As set forth above, the Court does not begin the *Johnson* evaluation of a fee shifting request until a lodestar calculation is completed. Barrett Burke and Bryant typically presented their hourly fee statements for review by this Court. The fee statements are submitted in cases in which there is an agreement with the debtor or where there is a default order proposed. There is no opposition to the fees in either situation. Nevertheless, the Court does not idly issue agreed orders or default orders without regard to their content. *See In re Nair,* 320 B.R. 119. In the present case (and in most chapter 13 cases described above), the attorneys fees are paid out of the chapter 13 debtor's payments to the chapter 13 trustee. Inasmuch as the debtor is paying all of

her disposable income to the chapter 13 trustee (see § 1325(b)), the trustee has a limited pool of funds. If more is paid on attorneys fees, less is available for unsecured creditors. Accordingly, the amount "agreed" by the debtor is actually paid out of funds otherwise available to unsecured creditors. The Court must be satisfied that the fee shifting is reasonable in light of controlling Fifth Circuit authority.

### First Defense: No Time Records Are Required to Engage in Fee Shifting

Barrett Burke's first defense is that it was not required to submit time records at all. As set forth below, that is not correct. However, even if that position were found to be correct, it is hardly a defense. Barrett Burke *did* submit time records for the purpose of obtaining a favorable order from this Court. Once Barrett Burke chose to submit the time records, it was required to do so candidly, in compliance with its obligations to the Court, and in a manner that conformed with Fed. R. Bankr. P. 9011.

Barrett Burke's authority for the proposition that contemporaneous time records are not required when a secured creditor attempts to shift fees is tenuous at best. Initially, the Court reviews the authority cited by Barrett Burke.

For the proposition that "[a]ttorney's fees determined in this manner and in this marketplace by the insuring agencies of the federal government are *per se* reasonable. Market rates have been recognized as appropriate fees by bankruptcy courts and judges. Many judges have found that such flat fees and/or value billing should be utilized rather than seeking to impose a lodestar approach", Barrett Burke cites to *Harman v. Levin,* 772 F.2d 1150, 1153 (4th Cir. 1985) and to *In re Patronek,* 121 B.R. 728, 731-32 (Bankr. E.D. Pa. 1990). *Harmon* does not deal with fee shifting. To the extent that it applies to fee calculations, *Harmon* actually stands for nearly the opposite proposition than the one advocated by Barrett Burke. *Harmon*

7

found no error when a bankruptcy judge applied the *Johnson* factors and arrived at a downward adjustment for a debtor's lawyer. Among other things, the *Harmon* court noted that many of the *Johnson* factors would be duplicative "if the court first determines the hours expended by the attorney and a reasonable hourly rate for his services." *Harmon*, 772 F.2d at 1152, n.1. Similarly, *Patronek* has no bearing on the matter for which it is cited. *Patronek* deals with an award to a chapter 13 debtor's attorney. Although there is an extended discussion, in *dicta,* of market rates for services to debtors, the Court's ultimate conclusion—that the fee should be $1200, was based on its finding that the hourly fee statements allowed for the billing of "no more than 12 hours of services" at a $100 hourly rate. Moreover, the *dicta* in *Patronek* (a Pennsylvania decision) rejects the Fifth Circuit's *Johnson* factors. That is a freedom not visited on this Court, and the rejection of the *Johnson* factors is inappropriate. In any event, *Patronek* was not a fee shifting case and has no bearing on the decision before the Court.

Barrett Burke also claimed that the case law supported the proposition that a secured creditor should be awarded its fees when "(i) it is oversecured; (ii) that the contract between the mortgage lender and the debtor is consensual and provides for such fees and costs; and (iii) the fees are reasonable." For this proposition, Barrett Burke relied on *In re Reposa,* 94 B.R. 257, 259-60 (Bankr. D.R.I. 1988) and *In re Mills,* 77 B.R. 413, 418 (Bankr. S.D.N.Y. 1987). Although Barrett Burke correctly states the theoretical proposition of law set forth in those cases, it misses the point. The fee shifting that was proposed by the secured creditor in *Reposa* was *not* allowed because, among other things, the secured creditor failed to submit accurate contemporaneous time records. The Court in *Mills* based its decision on a review of the contemporaneous time log and ultimately reduced the requested fee to an amount determined according to the number of hours expended multiplied by the reasonable hourly rate.

Indeed, Barrett Burke attempted to stretch the case law so far as to argue that "use of the lodestar method of awarding fees is not appropriate in Chapter 13 cases," citing *In re Watkins,* 189 B.R. 823, 829 (Bankr. N.D. Ala. 1995). That is not the holding in *Watkins.* The Court in *Watkins* was dealing with debtor's counsel's fees—not with fee shifting. Much like this Court's analysis in its General Order 2004-5, the *Watkins* Court held that it was impracticable to perform the lodestar analysis on a case by case basis. Instead, it performed the analysis "on a collective basis to chapter 13 fee requests in the Northern District of Alabama." *Watkins*, 189 B.R. at 831. The Fifth Circuit has recently affirmed the use of a collective analysis in chapter 13 cases, but based its decision on the fact that the Court utilized the collective analysis as a threshold for the individualized analysis required by *Johnson. In re Cahill,* 428 F.3d 536 (5th Cir. 2005). Nothing in *Watkins* or *Cahill* supports Barrett Burke's position.

In closing arguments, Barrett Burke attempted to direct the Court to further authority to support its position. It cited *In re Evangeline Ref. Co.,* 890 F.2d 1312 (5th Cir. 1989) for the proposition that contemporaneous records were not required, *In re Fender*, 12 F.3d 480 (5th Cir. 1994) for the proposition that the traditional lodestar approach is but one of many factors to be applied by the Court, and *in re Lawler,* 807 F.2d 1207 (5th Cir. 1987) for the proposition that a court would not abuse its discretion in determining lodestar fees for attorneys who failed to specify the amount of time devoted to each phase of a bankruptcy proceeding. Again, Barrett Burke's legal authorities are wanting. *Evangeline* does hold out the possibility that estimated hours might justify a fee award. But, *Evangeline* states that "because Wooten originally presented the fee applications to Judge Bernard without noting that they were essentially estimates, and because the over-billing by Wooten only fully came out on cross-examination by Continental, one could infer that Wooten sought to deceive the court." *Evangeline*, 890 F.2d at

9

1325. The *Evangeline* Court does give guidance on incomplete applications. The failure to maintain contemporaneous time records is not a *per se* reason for denial of the application. The Court may be able to consider extraneous information to the fee records in order to apply the *Johnson* factors; if the Court can do so, a fee award may still be appropriate. *Id.* at 1325-26. Put simply, contemporaneous time records should be kept, but the failure to keep them is not necessarily fatal. In the case before this Court, the issue is not whether the fees should be denied in their entirety; Barrett Burke has withdrawn its fee application. The issue before this Court is the one addressed earlier in *Evangeline*—did the fee applicant intend to mislead? If so, the remedy should be substantial. *Fender* is also not helpful to Barrett Burke's position. *Fender* merely stands for the proposition that any fee analysis in the Fifth Circuit is governed by *Johnson.* After applying the number of hours and the rate charged, the Court should make appropriate adjustments in accordance with the additional factors listed in *Johnson. Fender*, 12 F.3d at 488. *Fender* found that the Court had not properly applied *Johnson* and remanded so that *Johnson* would be utilized without double counting some of the *Johnson* factors. *Lawler* also requires the application of the *Johnson* factors. In *Lawler,* detailed time records were submitted, but the records were not broken down by phase of the bankruptcy case. The Court found that the detailed time records were sufficient. However, nothing in *Lawler* supports Barrett Burke's legal theory in this case.

The teachings of the above referenced case law are straightforward. The cases universally hold that the initial analysis that must be undertaken by the Court is to determine the number of hours spent on a case and to multiply that number of hours by an hourly rate. The hours spent is ideally determined by contemporaneous time records. If those records are not

available, the Court may use a proxy—testimony about what occurred, collective standards of reasonableness, or other evidence.

Once the Court has determined the lodestar factor, the lodestar should be adjusted, if appropriate, by the balance of the *Johnson* factors. The lodestar approach, as adjusted by the balance of the *Johnson* factors, produces the reasonable amount of the fee. If the *Johnson* factors do not provide a reason for a departure, then the lodestar fee is the reasonable fee.

In this case—and in thousands of others—Barrett Burke determined on its own what a "reasonable fee" would be. Having determined the reasonable fee, it estimated its hours at an amount that—when multiplied by the hourly rate of the attorneys and paralegals working on the case—produced the conclusion that Barrett Burke thought was fair.

To be sure, Barrett Burke recognizes the seriousness of this Court's show cause order. But, what is most puzzling to the Court is that Barrett Burke fails to appreciate what is wrong with the approach they have taken and how fundamentally it distorts our adversarial system.

Courts decide disputes. Courts base their decisions on evidence. When the evidence is created after-the-fact to justify a litigant's foregone conclusion, the Court cannot perform its function. The problem is particularly perverse when the information is uniquely within the province of one of the litigants. The number of hours spent by Barrett Burke on a particular task is really only known to Barrett Burke's timekeepers. The debtor and the creditors of the estate cannot reasonably challenge whether a paralegal spent 0.2 hours or 0.7 hours preparing a proof of claim. To make the system work, the Court relies on the time records maintained by the fee shifting entity. Presumably, those records are generally accurate. What the Court has learned in this matter is that the "records" are not records at all. To be sure, Barrett Burke maintained

records of the tasks that it performed, but it did not record how much time was spent on those tasks. It "created" a time estimate only when the Court required a *Johnson* hearing.

**Second Defense: The Fees Are Reasonable**

Barrett Burke's second defense is that the fees that it charges are *per se* reasonable because they represent the fees commanded by the marketplace. As with its first defense, this too fails. Barrett Burke chose to present its fee applications as lodestar applications. It did not choose to seek fees on a flat fee basis.

Nevertheless, the evidence presented by Barrett Burke on its fixed fee defense was unpersuasive.

The Federal National Mortgage Association ("Fannie Mae"), the United States Department of Housing and Urban Development ("HUD"), Federal Home Loan Mortgage Corporation ("Freddie Mac"), the United States Veteran's Administration ("VA") and a handful of others[2] play a major role in providing home mortgages for middle class Americans.

In recent years, over 1.5 million families have sought refuge in the bankruptcy courts of this Country. Most of those have home mortgages backed by a Mortgage Sponsor. However, the Mortgage Sponsors do not generally service their own mortgages. Instead, private entities contract to work as servicing agents ("Servicers") for the Mortgage Sponsors.

The Servicers are authorized by the Mortgage Sponsors to retain counsel when a consumer files a bankruptcy case. The Servicers are reimbursed by the Mortgage Sponsors for all or a portion of the cost of counsel. Importantly, most Servicers represent multiple Mortgage Sponsors.

---

[2]   For ease of reference, Fannie Mae, HUD, Freddie Mac, VA and the others are collectively referenced as "Mortgage Sponsors."

Barrett Burke contracts with Servicers to provide legal representation. In many instances, Barrett Burke will provide legal representation to one Servicer under a business arrangement that includes a portfolio of loans from multiple Mortgage Sponsors. Each Mortgage Sponsor has published a set of guidelines that sets forth the maximum that the Mortgage Sponsor will pay for reimbursement to a Servicer for legal representation in a consumer bankruptcy case. Although these guidelines can be varied in exceptional circumstances, Barrett Burke's witnesses were unable to recall any instances in which the guidelines were varied.

The fee reimbursement arrangements from the Mortgage Sponsors were summarized in testimony and exhibits before the Court. The following is a summary:

| Mortgage Sponsor | Type of Case | Maximum Reimbursement |
| --- | --- | --- |
| HUD | Chapter 7 | $650.00 |
| HUD | Chapter 13 | $1,000.00 |
| Freddie Mac | Chapter 7 | $500.00 |
| Freddie Mac | Chapter 13 (through plan confirmation) | $450.00 |
| Freddie Mac | Chapter 13 (after plan confirmation) | $350.00 |
| VA | Chapter 7 | $450.00 |
| VA | Chapter 13 | $650.00 |

Barrett Burke argues that its fee charges are *per se* reasonable because they are market driven fees. However, the testimony was undisputed that the work done by Barrett Burke was virtually identical, without regard to which Mortgage Sponsor was setting the rates. Accordingly, for the identical work on a post-plan-confirmation chapter 13 case, the reimbursement was $1,000.00 from HUD but only $350.00 from Freddie Mac.

Barrett Burke's representatives testified that they lost money providing services for $350.00. Nevertheless, they undertook the work because that was the way in which they were able to negotiate obtaining a portfolio of loans from a Servicer. Because work with a $1,000.00 reimbursement *overcompensates*, the firm undertakes work for $350.00 that *undercompensates*. Because Barrett Burke take both types of work, the Servicers do business with Barrett Burke.

While it is true that the market drives the average rates for undertaking a portfolio of work, it is unambiguous that the rates of reimbursement on particular loans are not market driven. A true "market" produces substantially similar rates for substantially similar work. In the work performed by Barrett Burke, substantially similar work has a rate variability of 285%.[3] When Servicers purchase a basket of goods, the total price of the basket is market driven; the price of the components may be—and in this case are—arbitrary. Barrett Burke seeks to have the Court determine that the component price is the market price; it is the basket of goods that is the market price and Barrett Burke introduced no evidence with respect to the average price of services in the basket[4].

An example may be helpful. Suppose that a restaurant offered a special dinner for $20.00, but that dinner for a companion was offered for only $5.00. The two dinners were identical, but cooked to taste. In this simple example, the market price for the two dinners is known; it is $25.00. That combination is the equivalent of the portfolio that is being sold by Barrett Burke to the Servicers. However, Barrett Burke asks the Court to conclude that the market price for one of the dinners is $20.00 and that the market price for the other is $5.00.

---

[3]  There is no evidence before the Court as to why some Mortgage Sponsors (such as HUD) overcompensate counsel. Nevertheless, the Court recognizes that government policies may not always be market driven and that the incentives for market pricing may not exist in governmental programs. Freddie Mac, the entity with the lowest reimbursement rates, is not part of the government.

[4]  The Court notes that such an average raises other concerns. If Freddie Mac is only paying $350.00 for a service with an average value of $500.00, can the Debtor be forced to pay $500.00?

That is not known and not rational.  Markets produce equilibrium prices based on supply and demand.  Just as Barrett Burke is unwilling to perform Freddie Mac's work without the balance of the portfolio, so is the restaurant unwilling to sell the companion meal at $5.00 without selling the first meal at $20.00.

Although the Court believes that the ultimate reasonableness of Barrett Burke's fees is a side issue from the issue of whether Barrett Burke misled the Court, the foregoing discussion is nevertheless very important.  Barrett Burke believed that it was acceptable to present its created time records to the Court because its fees were *per se* reasonable because they were market driven.  By not allowing the underpinnings of that theory to be examined in open Court, Barrett Burke avoided the necessary scrutiny of its false theory as to reasonableness.

In essence, this is another reason why the means cannot be used to justify the ends in a court proceeding.  Candor is required.  Sometimes—and this appears to be one of those times— even the ends were not reasonable under the circumstances.

### Third Defense: Empty Head and Pure Heart

Barrett Burke and Bryant ask this Court to conclude that the false testimony given by Bryant was an unfortunate error on her part.  Based on the totality of the circumstances, the Court declines to accept this explanation.

Taken as a whole, Barrett Burke designed a system that was intended to create after-the-fact time entries—and to present those time entries to the Court as business records.  Bryant is an integral part of Barrett Burke's team of lawyers.  Following this Court's October 1, 2004 announcement, Barrett Burke could have chosen to come forth and advise the Court that it did not maintain contemporaneous time records but that it believed that its fees should nevertheless be approved.  It did not do so.  Instead, it devised a "template" that looked like a fee statement.

The Court concludes that Barrett Burke and Bryant presented the template (time and again) for the purpose of having the template accepted as a Barrett Burke business record.

The fee statements were not challenged, until Ms. Porcheddu decided to do so. When challenged, Bryant testified that the records were contemporaneous business records and that she was the custodian of those records. Bryant had to know that at least one of those two statements was false. If she was the custodian of the records, then she knew that the entries were not contemporaneously made. If she was not the custodian of the records, then she falsely testified that she was the custodian.

To be a records custodian, one must "have knowledge of the procedures under which the record is created." *Rambus, Inc. v. Infinen Tech. AG,* 348 F. Supp. 2d 698 (E.D. Va. 2004). The threshold is not a high one but in *Rambus* the Court found that records were not admissible when the witness had no familiarity with the maintenance and creation of the records at issue. *Id.* Similarly, the Eleventh Circuit found that a witness who had been designated as a custodian, but had no familiarity with the records could not testify as a records custodian. *Nationalist Movement v. City of Cumming,* 913 F.2d 885 (11th Cir. 1990). Similarly, a Department of Justice employee could not sponsor documents from the Internal Revenue Service.

> The fact that both the IRS and the DOJ are branches of the federal government does not qualify Mr. Snoeyenbos to vouch for the authenticity of these documents. The government has not provided a declaration from an IRS employee with personal knowledge competent to testify to the authenticity of these copies.

*United States v. Novelli,* 381 F. Supp. 2d 1125 (C.D. Ca. 2005).

Bryant is an experienced trial attorney. Indeed, the testimony before the Court is that Bryant functions only as a trial attorney; others negotiate transactions and she presents them in Court or argues for the lifting of the automatic stay. It is unfathomable that she would be so

16

nervous when testifying that she would make the following statements, all of which she now says are false:

1.    "I am the record keeper for this particular loan."

2.    "It's (the fee statement) a compilation of data."

3.    "I am the custodian of the record"

4.    "The record was made by persons with knowledge of the facts at or near the time of the event that those actions occurred."

5.    "The record is part of our regular business practice, and it's maintained in our records."

6.    [When questioned about a particular time entry] "No, but she (Monica Martinez) made that at the time she did the work."

7.    Q: "What software system do you use for time keeping?" A: "Timeslips."

The current position is that Bryant does not keep the records on any loan; those are maintained by others. The fee statements are not a compilation of data, but are prepared from after-the-fact memory. Bryant is not the custodian of any records.[5] The time entries were not made at or near the time of the event. The hourly time records are prepared for litigation purposes and not normally maintained because the firm is on a fixed fee basis with its clients. Martinez did not make the time entry at the time that she did the work. The records were not kept using the Timeslips software system.

Ms. Bryant is too smart to make that many inadvertent mistakes.

Moreover, the false statements are all consistent with Barrett Burke's business practices. Without that testimony, the entire "template" system would come crashing down. Indeed, when the Court required that Barrett Burke's employees testify, Bryant suggested that it might be best just to write down the fees in excess of the $500.00 ceiling in order to avoid the inquiry.

---

[5] At the hearings on this matter, Barrett Burke indicated that it improperly believed that the attorney in possession of a file was considered the custodian of the records included in that file.

The Court rejects the defense and finds that the testimony was given because of Bryant's and Barrett Burke's belief that (i) the testimony was inconsequential and (ii) the testimony would lead to the correct result.

Of course, no false testimony is ever inconsequential.

Because of Barrett Burke's actions, the Court will not know the correct result with respect to the award of fees. Nevertheless, the Court does not believe that Bryant or Barrett Burke were intentionally attempting to obtain more for their clients than the amount to which they were justly entitled. They honestly believed that their fees were reasonable. And, they may have been.

### Barrett Burke

In determining appropriate sanctions, the Court should limit the sanction to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated. Fed. R. Bankr. P. 9011(c). In evaluating the appropriate sanction, the Court has examined both the general and prior conduct of Barrett Burke and Bryant before this Court.

Barrett Burke is one of the leading firms representing creditors in consumer bankruptcy cases in the United States Bankruptcy Court for the Southern District of Texas. Although Barrett Burke represents a variety of creditors, the firm specializes in representing home mortgage lenders who seek relief from the automatic stay in consumer chapter 7 and chapter 13 cases. In a typical week, this Court considers 25-30 motions for relief from the stay filed by Barrett Burke.

Although Barrett Burke occasionally sends another attorney to this Court to represent its clients, Bryant is the attorney who most frequently appears. Over the course of a year, the Court estimates that Bryant appears as creditor's counsel in over 1,000 motions for relief before the

undersigned. In the Southern District of Texas, Barrett Burke prosecutes over 5,000 motions for relief from the stay in a typical year.

Barrett Burke has been an active participant in the bench/bar relationship in the Southern District of Texas. It willingly serves on bench/bar committees, devotes its attorney's time to continuing legal education matters, and provides a valuable service to its clients.

Barrett Burke's reputation is not without blemish. Two unpublished opinions in the Northern District of Texas initially gave this Court substantial concern. In *In re Davis,* Case No. 02-10389 (N.D. Tex. December 2, 2003), Judge Jones sanctioned Barrett Burke for intentionally making material changes to a proposed agreed order without obtaining opposing counsel's consent. In *In re Thompson,* Case No. 01-10399 (N.D. Tex. April 8, 2003), Judge Jones found that Barrett Burke acted recklessly, wantonly and in bad faith in filing (and failing to correct) a motion for relief from the automatic stay. Judge Jones' comments are harsh, but are given reduced weight because they are unpublished. Barrett Burke has filed a detailed explanation of the events that led to Judge Jones' orders. The Court accepts the explanation filed by Barrett Burke. Accordingly, given Barrett Burke's explanation and the reduced weight given to these opinions because they are unpublished, these opinions have not influenced the Court's decision.

Of greater concern is a published opinion from the Western District of North Carolina. *In re Tate,* 253 B.R. 653 (Bankr. W.D. N.C. 2000). In that case, Barrett Burke engaged in conduct that is substantially similar to the conduct in this case. Judge Whitley found that Barrett Burke assisted its client, NationsBanc Mortgage, by including a charge for post-petition attorneys fees in the figures set forth as pre-petition claims in proofs of claim. He found that this procedure was being utilized to avoid the scrutiny that a bankruptcy court is required to apply whenever a lender attempts fee shifting under § 506 of the Bankruptcy Code. As in this case, it was not so

much the amount of the charge as the fact that Barrett Burke and NationsBanc were attempting to avoid Court scrutiny that raised substantial concerns in *Tate.*

As in *Tate,* this Court has substantial concerns over whether Barrett Burke—believing in its own mind that its fees were reasonable—decided to engage in conduct that took a detour around the safeguards established by law. Barrett Burke has also filed a detailed response with respect to the *Tate* decision. However, the explanation regarding *Tate* is unpersuasive. Barrett Burke refers this Court to other opinions—most notably *In re Powe,*281 B.R. 336 (Bankr. S.D. Ala. 2001). The Court in *Powe* rejected a portion of the legal issue in *Tate* (i.e., whether an oversecured lender was required to utilize a fee application rather than including its fees on its proof of claim). However, the *Powe* Court found that an inadequate description on a proof of claim (similar to the inadequate description used by Barrett Burke in the *Tate* decision) was insufficient. In *Tate,* Barrett Burke had failed to note that the fees set forth on the proofs of claim were even for its client's recovery of post-petition attorney fees. The creditor in *Powe* had the identical problem. Accordingly, the distinction between *Tate and Powe* has nothing to do with whether the conduct was deceptive; the distinction is much more a distinction with respect to the appropriate remedy.

The Court does not sanctions Barrett Burke with respect to any conduct described in *Tate.* Instead, the Court considers *Tate* solely for the purpose of determining the amount of sanction reasonably required to deter future wrongful conduct.

Nevertheless, the Court must repeat its earlier findings. This conduct was not undertaken by Barrett Burke to obtain more than Barrett Burke thought that its clients were entitled. Instead, the conduct was undertaken to achieve what Barrett Burke honestly believed to be a just result.

Barrett Burke did submit what it thought was reasonable. It just did not give the adversarial system a reasonable opportunity to function.

### Rule 11 and Other Authority to Sanction

The submission of after-the-fact fee statements—that Respondents purport to be admissible under the business records exception to the hearsay rule—appears to have become standard practice for Barrett Burke and Bryant. By submitting a paper to the Court (i.e., the Barrett Burke fee statements), Respondents are certifying that to the best of their knowledge, information and belief, *formed after an inquiry reasonable under the circumstances,* the paper is not being presented for an improper purpose. FED. R. BANKR. P. 9011. It appears that Barrett Burke's fee statements are submitted with the intent that the Court rely on the statements as records admissible under the business record exception.

This Court has the inherent authority to regulate the practice of litigants and lawyers appearing before it. *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991).

This Court is astonished that a firm that engages in continuing and active practice in the bankruptcy court would submit fee records that do not reflect contemporaneous time records. Although the case law allows exceptions to the contemporaneous records requirement, those exceptional circumstances must be brought to the Court's attention by the applicant. Surely, a fee applicant cannot submit records that *appear* to be contemporaneous, offer the records under the business records rule, testify that the records were kept contemporaneously, and then expect to fall under the exception to the general rule. But, that is precisely what Barrett Burke now asks this Court to accept.

## Remedy

As set forth above, the Court must determine the appropriate remedy to assure that the conduct described in this memorandum is not repeated by Barrett Burke, by Bryant or by others who are similarly situated. In considering the appropriate remedy, the Court makes special note of the following issues:

1.     The conduct is very serious. Barrett Burke and Bryant violated a solemn duty to this Court.

2.     The conduct is likely to be repeated (in some variant) without a substantial sanction. In this regard, the Court finds that Barrett Burke engaged in similar conduct in the *Tate* matter. Although it was Barrett Burke's client that suffered the consequences of the conduct (and in the final settlement, admitted to no wrongdoing), Barrett Burke was the actor that engaged in the wrongful conduct.

3.     At the hearings on this matter, Barrett Burke professed sincere regret. However, Barrett Burke's expressions of regret were never an acknowledgement that its conduct was wrong. Instead, the regret was that Ms. Bryant had made a "misstatement." When asked what remedy was appropriate, both Barrett Burke and Bryant thought that no true remedy should be imposed. Barrett Burke did believe that it was appropriate that Bryant be required to attend an ethics course. However, Barrett Burke believed that its own conduct did not warrant any sanction at all—"We don't believe that sanctions would be appropriate." Closing Argument, December 8, 2005, p. 39, l. 21-22. Bryant asked for the benefit of the doubt, but also did not believe that sanctions were appropriate against her[6]. Taken as a whole, the proposal—that this

---

[6] Bryant has filed a statement with the Court that reflects that Barrett Burke imposed its own punishment against Bryant. Although the statement was not filed as an affidavit, the Court accepts the statement as true.

Court do nothing—reflects that Barrett Burke and Bryant fail to appreciate the gravity of the situation to the extent required to assure that the conduct is not repeated.

4.     The Court also weighs the fact that Barrett Burke frequently appears before this Court and that its conduct has generally been acceptable before the undersigned Judge. In considering an appropriate remedy, the Court finds that such prior acceptable conduct exemplifies that a lesser remedy may be sufficient to deter future unacceptable conduct.

5.     One of the factors to be considered in determining the amount, if any, of monetary sanctions is the respondent's ability to pay. There is no direct evidence regarding either Bryant's net worth or Barrett Burke's net worth. Nevertheless, Barrett Burke is awarded thousands of dollars in fees every week by this Court alone.

6.     From statements made at the hearing in this case, the Court is convinced that Barrett Burke has already suffered substantial reputational damage.

The Court has also examined what sanctions have been imposed by other courts. Frequently the amount of sanctions are determined by examining opposing counsel's attorneys fees. In general, this Court rejects fee shifting as the only appropriate measure of sanctions. The fees incurred by others may or may not properly measure the amount that is appropriate to deter future wrongful conduct by a party. *Fox v. Acadia State Bank*, 937 F.2d 1566, 1571 (11th Cir. 1991). When the sanctions are imposed on the Court's own motion, it may be inappropriate to examine the Court's own cost of operation as an appropriate measure. *Blue v. United States Dep't of Army*, 914 F.2d 525, 548 (4th Cir. 1990). Accordingly, the Court will examine the particulars of the conduct, the party, and the required deterrent in order to assess an appropriate sanction.

23

In *Chambers,* the Supreme Court affirmed the imposition of sanctions of $996,644, disbarment and suspension for bad faith conduct of a defense of a contract suit. *Chambers*, 501 U.S. at 55-58. In that case, the monetary award was based on a measure of opposing counsel's fees, but additional sanctions were added to assure proper deterrence. In other cases, sanctions have been limited to an admonishment of counsel. However, admonishments are generally limited to situations that are substantially less egregious than the conduct before this Court. *Traina v. United States*, 911 F.2d 1155, 1158 (5th Cir. 1990) (reprimand for reliance on inapplicable case law); *Cargile v. Viacom Int'l, Inc.*, 282 F. Supp. 2d 1316, 1320 (N.D. Fla. 2003) (reprimand for filing frivolous pleading where counsel subsequently advised client to dismiss case and it was counsel's first Rule 11 violation); *Miller v. Norfolk So. Ry. Co.*, 208 F. Supp. 2d 851, 854 (N.D. Ohio 2002) (reprimand for filing frivolous motion to reconsider which simply repeated earlier arguments); *Jenkins v. Methodist Hosp. of Dallas Inc.*, 2004 WL 2871006, at *2 (N.D. Tex. Dec. 14, 2004) (reprimand for failure to proofread brief and correct erroneous quotation upon discovery of error).

With respect to Barrett Burke, the Court is unable to locate authority that is sufficiently analogous for direct guidance. Its conduct has been over a sustained period of time and was planned conduct. Bryant's conduct was much less planned and was not sustained, but she gave direct, false testimony.

The Court has struggled with the assessment of a fair sanction against Barrett Burke that would suffice to deter future conduct by Barrett Burke and by those similarly situated. Absent ameliorating factors, the Court would find that a sanction equal to the approximate attorneys fees billed by Barrett Burke on two week's worth of Barrett Burke's cases in the Southern District of Texas to be an appropriate sanction. Two week's worth of fees would be a substantial sanction

imposed against any firm and would appropriately adjust the sanction to the size of the firm. A sanction measured by a shorter period of time would generally be too small to act as an effective deterrent. A substantial sanction is commanded by the planned nature of the conduct. At a $650 per case average, the Court calculates that Barrett Burke bills approximately $125,000 over a two week period.

Nevertheless, as set forth above, there are substantial ameliorating factors. First, the extent of reputational damage to Barrett Burke appears to be substantial. The Court was substantially persuaded by Ms. Daffin's testimony in this regard. The reputational damages should reduce the monetary award. Although the amount of appropriate reduction is difficult to measure, the Court will reduce the amount by 33% based on this factor. Second, although the conduct in this case is serious, Barrett Burke has not previously engaged in similar sanctionable conduct before this Court. Although such a record might not always be a consideration, Barrett Burke appears in this Court in over 100 hearings each month. This history makes the Court conclude that lesser sanctions are justified. Conversely, the Court remains concerned about whether this conduct is a continuation of the conduct criticized in *Tate*. After full consideration, the Court further reduces the sanctions amount by an additional 15% based on this factor.

The Court will assess an award against Ms. Bryant based on a proportional adjustment, reduced because of the internal punishment already assessed by Barrett Burke. Although there is no direct evidence of Ms. Bryant's net worth or income, the Court bases its award on attorney salaries generally in the Houston area.

Based on the foregoing, the Court concludes that a sanction of $65,000 is an appropriate sanction for Barrett Burke's conduct and that a $1,000 sanction is an appropriate sanction for Ms. Bryant's conduct.

25

A separate order will be issued.

Signed at Houston, Texas on February 3, 2006.

MARVIN ISGUR
United States Bankruptcy Judge